IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WASHINGTON, AT SEATTLE

| | |
|---|---|
| In re: | NO. 18-12353-CMA |
| DRY EYE COMPANY, LLC. | DRY EYE COMPANY, LLC'S SMALL BUSINESS COMBINED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION, DATED APRIL 10, 2019 |
| DEBTOR | |

I.      Introduction

This is the Debtor's combined disclosure statement (the *Disclosure Statement*) and plan of reorganization (the *Plan*) in the small business chapter 11 case of Dry Eye Company, LLC. (the *Debtor*). The Disclosure Statement provides information about the Debtor and the Plan to help you decide how to vote.

**Your rights may be affected**. You should read the Combined Disclosure Statement and Plan carefully. You may wish to consult an attorney about your rights and your treatment under the Plan.

The Plan and its proposed distributions begin on Page 8. Non-priority unsecured creditors holding allowed claims will receive distributions, which the proponent of this Plan has valued at approximately 25 cents on the dollar. This Plan also provides for payment of secured and administrative claims.

A.  Purpose of this Document

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case,
- How the Plan proposes to treat claims or equity interests of the type you hold (i.e., what you will receive on your claim or equity interest if the plan is confirmed),
- Who can vote on or object to the Plan,
- What factors the Bankruptcy Court (the Court) will consider when deciding whether to confirm the Plan,
- Why The Dry Eye Company, LLC believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

or equity interest in liquidation, and
- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

**The Plan begins herein on Page 8.**

B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan described in this Disclosure Statement. A separate order has been entered setting the following information:

- Time and place of the hearing to [finally approve this disclosure statement and] confirm the plan,
- Deadline for voting to accept or reject the plan, and
- Deadline for objecting to the adequacy of disclosure and confirmation of the plan.

If you want additional information about the Plan or the voting procedure, you should contact Vortman & Feinstein:

Addresses: 929 108th Ave NE, Suite 1200, Bellevue, WA 98004 and 2033 6th Ave, Suite 251, Seattle, WA 98121.

Phones: 425-643-9595 and 206-223-9595

Emails: feinstein1947@gmail.com and kpscordato@gmail.com

C. Disclaimer

The Court has [conditionally] approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

II.    Background

A.  Description and History of the Debtor's Business

The Debtor is limited liability company, based in Poulsbo, Washington. Since 2005, the Debtor has been retail sales of products to improve the quality of life for people with eye-related concerns, including dry eye. In addition to retail sales, it engages in advocacy and education on behalf of the patient community with the medical community.

B.  Insiders of the Debtor

| | Position | Paid within one year prior to filing petition | Paid during Ch 11 | For |
|---|---|---|---|---|
| **Rebecca Petris** | Owner, Managing Member and President | $92,550.67 | $35,124.38 | Full Time Salary, less additional investment |
| **Panagiotis Petris** | Husband of Rebecca Petris | $269.59 | $876.78 | Hourly Payroll (occasional janitorial) |
| **Chaidie Petris** | Daughter of Rebecca Petris | $385.37 | $3,427.62 | Hourly Payroll (administrative & customer service) |
| **Lindy Thibodaux** | Sister of Rebecca Petris | $31,552.97 payroll $1,391.21 reimbursed expenses | $861.00 | As needed graphic design & video work on contract basis |

C.  Management of the Debtor During Bankruptcy

There is only one member for the limited liability company, <u>Rebecca Petris</u>.  She was the sole member prior to and during the Bankruptcy. Her position in the company is Owner, Managing Member, and President. She is responsible for daily operations of the business. Her compensation is listed in the table above.

D.  Events Leading to Chapter 11 Filing

The Dry Eye Company ("TDEC") began operations in 2005. Between 2005 and 2015, it grew steadily but slowly and organically, with revenues between $200-

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

300k and profits typically 15-20%. As a mission-driven business focusing on patient education and advocacy, growth was not specifically sought. For most of this time, TDEC was operated by its managing member, Rebecca Petris, and had no employees. TDEC's retail business consisted primarily in specialty consumer goods for dry eye disease with a typical margin of 50%. A much smaller part of the business was specialty supplies for a prosthetic device resembling a contact lens; these products are much lower margin (20-35%) but were stocked as a service to TDEC's customers, many of who use the device for vision impairments and/or pain control from corneal diseases including advanced dry eye disease.

A major disruption to the status quo occurred in 2015 and 2016. Three things intersected: (1) an industry supply problem (discontinuation of two unique products), (2) a new industry trend (explosive growth in specialty contact lenses for complex diseases and transplant patients), and (3) TDEC's unique role as an education center serving both doctors and patients. The only preservative-free saline solutions sold in drugstores were both suddenly discontinued by the manufacturers with no notice to doctors, distributors, or pharmacists (let alone consumers). This essentially 'orphaned' a large number of patients nationwide who can only function with their special bowl-like prosthetic lenses that have to be filled with this particular type of saline. TDEC researched, sought out and purchased unknown products that could perform the same function, created educational materials, and, in short order, became the national information center on the topic, responding to a nonstop stream of calls from patients, doctors and pharmacists around the country. At exactly the same time, demand for both the salines and all other products related to less rare specialty contacts used for a variety of diseases was exploding, and our internet visibility was funneling them all towards us.

TDEC's business was impacted in the following ways:
- Sales quadrupled in a matter of weeks.
- Margins plummeted, because the majority of new business was lens care products
- Stockroom and shipping needs completely changed
- Software requirements changed, with none of our earlier systems adequate to the new needs
- TDEC had to acquire a staff for customer service, stock management, order fulfillment, customer service and administrative assistance

In the wake of this situation, Ms. Petris spent all of 2016 and most of 2017 in bare hand-to-mouth survival mode trying to respond to an avalanche of phone calls and emails from visually disabled patients needing help. The industry eventually responded by launching new specialty products, but none are distributed in drugstores yet, and many have been subject to constant shortages due to rapidly growing demand.

By late 2017, TDEC had grown exponentially within the past two years. Along with the growth in sales came a growth in short term liabilities, as it was undercapitalized at the time. The company needed to assess the damage and to determine what it needed do to get a handle on its finances. By this point, it was

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

already too late as its short-term debt burden had become unsustainable to the point it could not be refinanced. TDEC continued throughout early to mid-2018 to pursue any and all options for refinancing and for recapitalization. When all other options had been exhausted and after seeking advice from experts, Ms. Petris finally made the decision to file Chapter 11.

### E. Significant Events During the Bankruptcy Case

There have been no sales outside of the ordinary course of business. The Debtor entered into a cash collateral order with First Home Bank, approved on July 6, 2018 at Docket #29, that required adequate protection payments of $2,382.03 monthly. The Court approved the employment of the law firm of Wells and Jarvis (Docket #35) and the law firm of Vortman & Feinstein (Docket #72) as attorneys for the Debtor. Also employed as the Debtor's accountant is Whitlock and Forster (Docket #36)

For more than a year now, TDEC has been engaged in (1) getting the education, advice and support necessary to turn the company around and (2) re-engineering the business model for sustainability and growth. The Debtor is confident now that the lessons have been learned, the problems have been addressed and once it has debt repayment schedule, it can move very rapidly into solvency, stable finances, and growth. Some of the specific steps taken by Ms. Petris during the Chapter 11 include:

- <u>SBA Emerging Leaders program</u> (April-October 2018). Ms. Petris was among the 20% of applicants accepted into this program in 2018 in Seattle and it was exactly the right thing at the right time. It was an intensive course in business management, and she will be continuing to digest and implement everything she learned from it for a long time to come. In addition to the changes discussed herein, the 'deliverable' from this course was the 3-year growth plan, which she is continuing to revisit and refine. This growth plan has helped to inform this Chapter 11 Plan.
- <u>Additional advice:</u> A Small Business Development Council advisor worked with Ms. Petris in 2018 to help prioritize issues and assess options. A prominent local financier spent several sessions with Ms. Petris helping her understand what to aim for in TDEC's numbers, and another financier and friend coached her long distance for a while. Ms. Petris also participates in an executive support group that meets monthly.
- <u>Product re-pricing:</u> One of the lessons learned from the SBA course is that small businesses cannot compete on pricing. Learning how to price and why was extremely helpful. TDEC re-priced everything last year and is continuing to carefully monitor all of its pricing at frequent intervals.
- <u>Cashflow forecasting</u> This was the biggest hurdle for Ms. Petris as she has always struggled with cashflow forecasting for this business. Over the past 6 months, Ms. Petris has finally achieved a model that makes sense

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

and will hold up. More than anything else, the work Ms. Petris put into this model gives TDEC confidence in what the future holds financially.

- <u>Content marketing:</u> People come to TDEC for information, service, and community as opposed to simply retail sales. The CEO coach teaching the SBA class helped Ms. Petris understand that TDEC's true product is information and multimedia. Since then, Ms. Petris has shifted much of her focus to developing the infrastructure to properly leverage the content TDEC creates, maximizing exposure through all of its channels (social media, email, etc).
- <u>Staffing</u>: TDEC reduced staffing substantially in the three months prior to filing Chapter 11 and continued to work hard towards a balance between maximizing productivity and upholding the company's people-centric values.
- <u>New nonprofit:</u> Throughout its history, TDEC has behaved like a nonprofit, both as an education and advocacy organization and for providing assistance to fixed-income patients through product subsidies. Rather than continuing to combine retail sales with advocacy/education, Ms. Petris started a small nonprofit organization operating independently of TDEC so that their strongly supportive community can participate more actively in these endeavors. As a result, TDEC's finances no longer bear the burden of these costs. The Dry Eye Foundation received its 501(c)(3) status recently. In the future, a portion of TDEC profits will be donated to the nonprofit, although donations will not begin until payments under this Plan have concluded.

At this point, TDEC has everything going for it. TDEC is poised for substantial growth in the coming years:

- The business model has been corrected and fine-tuned in areas that needed adjustments.
- The staff have proven their dedication and commitment.
- The market demand for its products is on a long and steep growth track for the foreseeable future.
- Content marketing is steadily growing.
- The industry shortages that have plagued TDEC for the past 3 years are beginning to ease.
- Every month, there is an increase in the numbers of eye doctors all over the country sending their patients to TDEC, at no marketing cost (word of mouth in the profession and from patients).
- For self-referred patients, TDEC's internet visibility is extremely high on all related topics.
- There are a host of additional products related to its core business that it can use to grow the business as soon as working capital permits.

In business terms, it is simply extraordinary that TDEC made it this far under nigh-impossible circumstances in the wake of the Chapter 11 petition filing. At the time of the filing, it was out of cash, it was almost out of inventory, and, suddenly,

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

it had to start paying cash up front for virtually everything. In addition, the summer of 2018 saw new product shortages in some key areas that accounted for more than 10% of their annual sales. Nevertheless, they have weathered the storms and are still here.

Revenues have stayed steady. The first quarter of 2019 was its strongest quarter in a year despite the fact that many key products were missing altogether and many others are chronically backordered (usually fatal for an ecommerce business where immediacy is everything). Even while spending very little on advertising, TDEC continues to get at least 500 new customers every month and enjoys very high repeat business rates.

How? TDEC is here because it has to be. It is here because it is determined to be. It is here because it has a community nationwide that cares about the company. It has vendors and doctors who know how hard the company's employees work and how much what we're doing matters. TDEC serves the underserved - people with a host of complex corneal diseases. The retail operation serves as an informal intake center, providing products but also connecting people to information, community connection, hope, and product information on a host of topics that no one else can speak to. Profits from sales are what keep TDEC independent of any outside corporate influence. The need for TDEC's services is constantly growing and it will continue to provide necessary products with excellent customer service.

F.  Projected Recovery of Avoidable Transfers

The Debtor does not intend to pursue preference, fraudulent conveyance, or other avoidance actions.

G. Claim Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. Disputed claims are treated in Article 5 of the Plan.

H. Current and Historical Financial Conditions

The identity and fair market value of the estate's assets as of the Petition Date are listed in Exhibit A.

The Debtor's most recent financial statements issued before bankruptcy, each of which was filed with the Court, are set forth in Exhibit B.

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

The most recent post-petition operating report filed since the commencement of the Debtor's bankruptcy case is set forth in Exhibit C. Attachments and exhibits to the report are available at ECF Docket #81 or upon request from Counsel.

III.    Summary of the Plan of Reorganization and Treatment of Claims and Equity Interests

A. What is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

B. Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. Therefore, the Plan Proponent has not placed the following claims in any class:

1. Administrative Expenses, Involuntary Gap Claims, and Quarterly and Court Fees

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 503(b) of the Code. Administrative expenses include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition, and compensation for services and reimbursement of expenses awarded by the court under § 330(a) of the Code. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment. Involuntary gap claims allowed under § 502(f) of the Code are entitled to the same treatment as administrative expense claims. The Code also requires that fees owed under section 1930 of title 28, including quarterly and court fees, have been paid or will be paid on the effective date of the Plan.

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

The following chart lists the Debtor's estimated administrative expenses, and quarterly and court fees, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Administrative expense: Vortman & Feinstein | Total: $10,000.00 (estimated) – Fees have not yet been approved by the Court | Approved fees will be paid in full on the effective date of the Plan, unless the holder of a particular claim has agreed to different treatment |
| Administrative expense: Wells and Jarvis | Total: $9,147.13 (approved at Dkt #64) Paid Prior to Confirmation: $7,641.57 Balance Remaining: $1,505.56 | Approved fees will be paid in full on the effective date of the Plan, unless the holder of a particular claim has agreed to different treatment |
| Administrative expense: Whitlock & Forster | Total: $1,000.00 (estimated) – Fees have not yet been approved by the Court | Approved fees will be paid in full on the effective date of the Plan, unless the holder of a particular claim has agreed to different treatment |
| Other administrative expenses | $0.00 | Paid in full on the effective date of the Plan |
| Statutory Court Fees | $1,950.00 | Paid in full on the effective date of the Plan - Debtor is current on its quarterly fees at the time of filing of this document (1st Quarter 2019 will be paid prior to Confirmation or before April 30, 2019, whichever occurs first). If any other amounts are due prior to confirmation, they will be paid in full on the effective date of the Plan. |
| Total Fees Approved and Due on Confirmation | $3,455.56 | |
| Total Estimated Fees | $22,097.13 | Subject to Bankruptcy Court Approval |

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

### 2. Priority Tax Claims

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim pursuant to 11 U.S.C. § 511, in regular installments paid over a period not exceeding 5 years from the order of relief.

The following chart lists the Debtor's estimated § 507(a)(8) priority tax claims and their proposed treatment under the Plan:

| Description | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| Internal Revenue Service | $0.00 | 9/27/2018 (Proof of Claim #1-3) | Debtor has paid all amounts outstanding through EFTPS. Any amounts incurred postpetition that are outstanding will be paid within 30 days of the effective date of the Plan. |

### C. Classes of Claims and Equity Interests

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

### 1. Classes of Secured Claims

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

| Class # | Description | | Treatment | |
|---|---|---|---|---|
| 1 | Name: First Home Bank (SBA) | Monthly Payment | $2,360.11 | |
| | Collateral: UCC1 on all assets ($54,337.24) | Begin Date | 15th day of the first full month following Confirmation | |
| | Allowed Secured Amount: $182,963.78 | End Date | April 30, 2027 | |
| | Priority of Lien: First Position | Interest Rate | 5% Fixed | |
| | Impairment: Yes | Total payout amount | $226,570 (estimated) | |

**Additional Information for Classes 2, 3, and 4:** These liens will be "crammed down" to the equity available in the property based on First Home Bank's First Position Lien of $182,963.78 and a market value of $54,337.24, leaving the available equity for these liens to attach as $0.00 as of the date of filing. Because there is no equity upon which for the liens to attach, pursuant to Section 1141(c) of the Bankruptcy Code, a lien that is wholly unsecured may be extinguished through a Plan of Reorganization. Accordingly, the second, third, and fourth position liens shall be extinguished as of the date of entry of an Order confirming this Plan, and the Debtor shall file a Notice of Lien Release, along with a copy of the Order confirming said Plan (and stripping the liens) with the Washington and/or Florida Departments of Licensing.

| Class # | Description | Treatment |
|---|---|---|
| 2 | Name: FC Marketplace, LLC<br>Collateral: UCC1 on all assets<br>Allowed Secured Amount: $0.00<br>Priority of Lien: 2nd position<br>Impairment: Yes | FC Marketplace, LLC filed a Proof of Claim herein for $113,227.50, as secured. The value of all assets at the time of filing was $54,337.24, and First Home Bank has a first position lien. Accordingly, this loan is wholly unsecured.<br><br>This lien shall be stripped upon entry of an Order Confirming Plan as described in the Additional Treatment (above). Creditor shall have a general unsecured claim under Class 5 (below). |

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

| 3 | Name: Reliant Funding<br><br>Collateral: UCC1 on all assets ($54,337.24)<br><br>Allowed Secured Amount: $0.00<br><br>Priority of Lien: 3rd Position<br><br>Impairment: Yes | Reliant Funding did not file a Proof of Claim in these proceedings. It was listed as having a value of $55,670.36 on the Debtor's Schedule D at Dkt #1, as being secured on all assets of the estate. The value of all assets at the time of filing was $54,337.24, and First Home Bank has a first position lien. Accordingly, this loan is wholly unsecured.<br><br>This lien shall be stripped upon entry of an Order Confirming Plan as described in the Additional Treatment (above). Creditor shall have a general unsecured claim under Class 5 (below). |
|---|---|---|
| 4 | Name: Webbank/Paypal<br><br>Collateral: Paypal Account ($163)<br><br>Allowed Secured Amount: $0.00<br><br>Priority of Lien: Fourth Position<br><br>Impairment: Yes | Paypal did not file a Proof of Claim in these proceedings. It was listed as having a value of $54,968.52 on the Debtor's Schedule D at Dkt #1, as being secured on the Debtor's Paypal account. The value of the account was $163 on the day of filing; however, and First Home Bank has a first position lien on all assets, including the Paypal account, that predates this loan. Accordingly, this loan is wholly unsecured.<br><br>This lien shall be stripped upon entry of an Order Confirming Plan as described in the Additional Treatment (above). Creditor shall have a general unsecured claim under Class 5 (below). |

## 2.  Classes of Priority Unsecured Claims

The Code requires that, with respect to a class of claims of a kind referred to in §§ 507(a)(1), (4), (5), (6), and (7), each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim, unless a particular claimant agrees to a different treatment or the class agrees to deferred cash payments.

Combined Disclosure Statement
and Plan of Reorganization

Page 12 of 24

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

There are no classes containing claims under §§ 507(a)(1), (4), (5), (6), and (7) of the Code.

### 3. Classes of General Unsecured Claims

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

All general unsecured claims belong to **Class 5**, which is impaired. All general unsecured claims listed below will receive a distribution equal to 25% of their claim based on the best efforts of the Debtor. (The liquidation value of the bankruptcy estate is $0.00.) Creditors will receive their pro rata distributions beginning August 15, 2019, or 15th day of the first full month following the effective date of the Plan, whichever occurs latest. No interest will attach to these claims. The total to be distributed will be **$77,569.65**. Debtor may elect to prepay or make payments less frequently than monthly at its sole discretion based upon cash flow and in the exercise of its business judgment. Payments will end 60 months following the payment start date (with the last payment due on August 15, 2024, approximately).

[Chart on following page]

Combined Disclosure Statement
and Plan of Reorganization

Page 13 of 24

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

| Class 5: General Unsecured Creditors | | | |
|---|---|---|---|
| Creditor | Allowed Unsecured Claim | 25% of Allowed Claim (Total to be Distributed) | Monthly Payment Amount for 60 months |
| FC Marketplace LLC | $113,227.50 | $28,306.88 | $471.78 |
| Reliant Funding | $55,670.36 | $13,917.59 | $231.96 |
| Paypal Working Capital | $54,968.52 | $13,742.13 | $229.04 |
| 7EyeSolvari | $9,701.76 | $2,425.44 | $40.42 |
| Alcon | $1,175.40 | $293.85 | $4.90 |
| Capital One | $9,457.57 | $2,364.39 | $39.41 |
| Cynacon/Ocusoft | $519.20 | $129.80 | $2.16 |
| DMV | $0.00 | $0.00 | $0.00 |
| Dream Essentials | $384.15 | $96.04 | $1.60 |
| Eye Eco | $15,276.25 | $3,819.06 | $63.65 |
| Focus Laboratories | $1,101.60 | $275.40 | $4.59 |
| Global Vision | $617.20 | $154.30 | $2.57 |
| Lobob Labs | $2,222.55 | $555.64 | $9.26 |
| Menicon | $11,958.80 | $2,989.70 | $49.83 |
| Oasis Medical | $13,956.00 | $3,489.00 | $58.15 |
| Purilens | $14,609.80 | $3,652.45 | $60.87 |
| Uline | $651.09 | $162.77 | $2.71 |
| Unishippers | $295.99 | $74.00 | $1.23 |
| UPS | $4,484.84 | $1,121.21 | $18.69 |
| | | | |
| Totals | $310,278.58 | $77,569.65 | $1,292.83 |

## 4. Classes of Equity Interest Holders

Equity interest holders are parties who hold an ownership interest (i.e., equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners. In a limited liability company (LLC), the equity interest holders are the members. Finally, with respect to an individual who is a debtor, the Debtor is the equity interest holder.

The following chart sets forth the Plan's proposed treatment of the classes of equity interest holders:

| Class | Description | Impairment | Treatment |
|---|---|---|---|
| 6 | Rebecca Petris | Unimpaired | Ownership shall not be affected by this Plan of Reorganization. |

Combined Disclosure Statement
and Plan of Reorganization

Page 14 of 24

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

D. Means of Implementing the Plan

      1. Source of Payments

Payments and distributions under the Plan will be funded through the ongoing operations of the Debtor. Additional capital contributions will be made by Rebecca Petris in April 2019, in the estimated amount of $15,000.00, from her personal income tax refund for 2018. The additional monies received will be used to purchase additional inventory, payroll, and other general business purposes consistent with the budget attached hereto.

      2. Post-Confirmation Management

Post-confirmation Management of the Debtor (including officers, directors, managing members, and other persons in control), and their compensation, shall be as follows:

| Name | Position | Compensation |
|------|----------|--------------|
| Rebecca Petris | Owner, Managing Member, and President | Salary - $65,000 annually |

E. Risk Factors and Tax Consequences of the Plan

The proposed Plan has very little risk, as ongoing operations should be sufficient to service the debts listed herein. The Debtor remains subject to the inventory of its vendors, as many key products have been on a significant back order in the last six months. Nevertheless, the Debtor's projections are conservative and have factored in their seasonal trends.

There are no known tax consequences of the Plan. You may wish to consult your own accountant.

F. Allowance and Disallowance of Claims

A disputed claim is a claim that has not been allowed or disputed by a final non-appealable order, and as to which either:
- A proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or
- No proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order.

The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

G. Executory Contracts and Unexpired Leases

The Debtor does not intend to assume any executory contracts and unexpired leases that the Debtor. *Assumption* means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any. If you object to the assumption, and if applicable the assignment, of your unexpired lease or executory contract under the Plan, the proposed cure of any defaults, the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

The Debtor intends to assume the following lease:

| Poulsbo Business Park, LLC 10156 Silverdale Way #11013 Silverdale, WA 98383 | Office/shipping facility lease for $1900/month |
|---|---|

All executory contracts and unexpired leases that are not listed in herein or have not previously been assumed, and if applicable assigned, or are not the subject of a pending motion to assume, and if applicable assign, will be rejected under the Plan on the effective date of the Plan. Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than twenty-one (21) days after the date of the order confirming this Plan. Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

IV.  General Provisions

A.  Definitions and Rules of Construction

The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan.

B.  Effective Date

The effective date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated.

C.  Severability

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

D.  Binding Effect

The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

E.  Captions

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

F.  Controlling Effect

Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Washington govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

G. Corporate Governance

Pursuant to § 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtor shall not issue any class of non-voting equity securities.

H. Retention of Jurisdiction

In the event a dispute arises as to the interpretation post-confirmation of this Plan or the payment terms therein, the Bankruptcy Court of the Western District of Washington shall retain jurisdiction over the Debtor and the claims administered herein even if the case has been closed.

V.   Confirmation Requirements and Procedures

To be confirmable, the Plan must meet the requirements listed in § 1129 of the Code. These include requirements that:
- The Plan must be proposed in good faith;
- If a class of claims is impaired under the Plan, at least one impaired class of claims must accept the Plan, without counting votes of insiders;
- The Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a Chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and
- The Plan must be feasible.

These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

A. Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. Except as stated in part IV.A.3 below, a creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that <u>Classes 1 through 5</u> are impaired and that holders of claims in those classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

believes that Class 6 is unimpaired and that holders of claims in that class, therefore, do not have the right to vote to accept or reject the Plan.

### 1. What is an Allowed Claim or an Allowed Equity Interest?

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either:

(1) The Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or

(2) The creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest.

When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

The deadline for filing a proof of claim in this case was <u>September 24, 2018.</u>

### 2. What is an Impaired Claim or Impaired Equity Interest?

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is impaired under the Plan. As provided for in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

### 3. Who is Not Entitled to Vote?

The holders of the following five types of claims and equity interests are not entitled to vote:

- Holders of claims and equity interests that have been disallowed by an order of the Court;
- Holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes;
- Holders of claims or equity interests in unimpaired classes;

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

- Holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code;
- holders of claims or equity interests in classes that do not receive or retain any value under the Plan; and
- administrative expenses.

**Even if you are not entitled to vote on the plan, you have a right to object to the confirmation of the Plan and to the adequacy of the Disclosure Statement.**

### 4. Who Can Vote in More Than One Class?

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

B. Votes Necessary to Confirm a Plan

If impaired classes exist, the Court cannot confirm the Plan unless
(1) All impaired classes have voted to accept the Plan; or
(2) At least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and the Plan is eligible to be confirmed by "cram down" of the non-accepting classes, as discussed later in Section B.2.

### 1. Votes Necessary for a Class to Accept the Plan

A class of claims accepts the Plan if both the following occur:
(1) The holders more than ½ of the allowed claims in the class who vote cast their votes to accept the Plan, and
(2) The holders of at least 2/3 in dollar amount of the allowed claims in the class who vote cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least 2/3 in amount of the allowed equity interests in the class who vote cast their votes to accept the Plan.

### 2. Treatment of Non-Accepting Classes of Secured Claims, General Unsecured Claims, and Interests

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan upon the request of the Plan proponent if the non-accepting classes are treated in the manner prescribed by

Combined Disclosure Statement and Plan of Reorganization

Page 20 of 24

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

§ 1129(b) of the Code. A plan that binds non-accepting classes is commonly referred to as a *cram down* plan. The Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not *discriminate unfairly*, and is *fair* and *equitable* toward each impaired class that has not voted to accept the Plan.

**You should consult your own attorney if a *cram down* confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.**

C. Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis is attached to this Disclosure Statement as Exhibit D. If the case were converted to Chapter 7, general unsecured creditors would receive a 0% distribution. The Plan proposes to make a 25% distribution based on its projected best efforts. Accordingly, general unsecured creditors will receive more under this Chapter 11 plan than if the case were converted to a Chapter 7 and liquidated.

D. Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

　　　1.　Ability to Initially Fund Plan

The Plan Proponent believes that the Debtor will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date. Tables showing the amount of cash on hand on the effective date of the Plan, and the sources of that cash are attached to this disclosure statement as Exhibit E.

　　　2.　Ability to Make Future Plan Payments and Operate Without Further Reorganization

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the Debtor's business.

The Plan Proponent has provided projected financial information. Those projections are listed in Exhibit F.

The Plan Proponent's financial projections show that the Debtor will have an aggregate annual average cash flow, after paying operating expenses and post-confirmation taxes, of $66,999 in 2020 and $94,661 in 2021.

VI. Effect of Confirmation of Plan

A. Discharge

On the effective date of the Plan, the Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the effective date, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor shall not be discharged of any debt:
(i)    imposed by the Plan, or
(ii)    to the extent provided in 11 U.S.C. § 1141(d)(6).

B. Modification of the Plan

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or re-voting on the Plan.

The Plan Proponent may also seek to modify the Plan at any time after confirmation only if
(1) The Plan has not been substantially consummated and
(2) The Court authorizes the proposed modifications after notice and a hearing.

C. Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

VII.   Other Provisions

A. Debtor reserves the right to seek confirmation of the Plan notwithstanding the rejection of the Plan by one or more classes of creditors, pursuant to 11 U.S.C. §1129(b).

B. All administrative expenses shall be paid on the effective date of the Plan, or as otherwise agreed by the parties without further court order.

C. The Debtor shall act as his own disbursing agent for payments under the Plan.

D. On the effective date of the Plan, all property of the Debtor's estate will vest in the reorganized Debtor pursuant to 11 U.S.C. §1141(b), free and clear of all claims and interests.

E. Unless otherwise specified, the following default provisions apply to all creditors:
   a. A "default" shall be defined as the debtor's failure to make a payment or otherwise perform in accordance with this Plan of Reorganization. The Debtor shall have a 15-day grace period following the due date specified herein, during which time the Debtor may make a cure payment. If no due date is specified, that date shall be the 15th day of the month.
   b. In the event of default and following the 15-day grace period, the creditor occasioning said default shall give the Debtor 30 days' Notice of Default and opportunity to cure. If said default is not cured within 30 days from the date of the Notice, the creditor shall be entitled to relief from the stay under this Plan without further court order, and may enforce any state or federal collection rights that may exist, or as otherwise provided in this Plan for default remedies.

F. Creditors nor any third party on their behalf may not take any actions (including, without limitation, lawsuits or other legal actions, levies, attachments, or garnishments) to enforce or collect either pre-confirmation obligations or obligations due under the Plan, so long as the Debtor are not in material default under the Plan and the creditor has not been granted relief from the stay. Provided that the Debtor does not materially default under the Plan, creditors shall be prohibited from taking any enforcement or collection actions or any kind against the Debtor.

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)

G. Any notices, requests, and demands required or permitted to be provided under the Plan, in order to be effective, shall be in writing (including, without express or implied limitation, by facsimile transmission and email), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made within actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

The Dry Eye Company, LLC
c/o Larry B. Feinstein
929 108th Ave NE, Suite 1200
Bellevue, WA 98004

Phone: (206) 223-9595 and 425-643-9595
Fax: (206) 386-5355
Email: feinstein1947@gmail.com and
kpscordato@gmail.com

Respectfully Submitted,

/s/ Rebecca Petris
Rebecca Petris, Managing Member
The Dry Eye Company, LLC

/s/ Larry B. Feinstein
Larry B. Feinstein, WSBA #6074
Kathryn P. Scordato, WSBA #41922
Attorneys for Debtor

VORTMAN & FEINSTEIN
929 108TH AVE NE, SUITE 1200
BELLEVUE, WA 98004
(206) 223-9595
(206) 386-5355 (fax)